## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEVEN CURAVO, derivatively on behalf of FMC CORPORATION,<br><br>    Plaintiff,<br><br>vs.<br><br>MARK A. DOUGLAS, ANDREW D. SANDIFER, PIERRE R. BRONDEAU, EDUARDO E. CORDEIRO, CAROL ANTHONY ("JOHN") DAVIDSON, KATHY L. FORTMANN, C. SCOTT GREER, K'LYNNE JOHNSON, DIRK A. KEMPTHORNE, MARGARETH ØVRUM, ROBERT PALLASH, and PATRICIA VERDUIN,<br><br>    Defendants,<br><br>    and<br><br>FMC CORPORATION,<br><br>    Nominal Defendant. | Case No.: 2:25-cv-02731<br><br><br>**DEMAND FOR JURY TRIAL** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

### <u>INTRODUCTION</u>

Plaintiff Steven Curavo ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant FMC Corporation ("FMC" or the "Company"), files this Verified Shareholder Derivative Complaint against Mark A. Douglas ("Douglas"), Andrew D. Sandifer ("Sandifer"), Pierre R. Brondeau ("Brondeau"), Eduardo E. Cordeiro ("Cordeiro"), Carol Anthony ("John") Davidson ("Davidson"), Kathy L. Fortmann ("Fortmann"), C. Scott Greer ("Greer"), K'Lynne Johnson ("Johnson"), Dirk A. Kempthorne ("Kempthorne"), Margareth Øvrum ("Øvrum"), Robert Pallash ("Pallash"), and Patricia Verduin ("Verduin") (collectively, the

"Individual Defendants," and together with FMC, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of FMC, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Douglas, Brondeau, and Sandifer. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding FMC, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by FMC's directors and officers from November 16, 2023 to February 4, 2025, inclusive (the "Relevant Period").

2.      FMC is a Delaware-incorporated company that develops and sells a range of crop protection products, including seed treatments, insecticides, herbicides, and fungicides. FMC sells its products primarily to distributors in North and Latin America, Europe, and Asia, who in turn sell said products to retailers who ultimately sell to end-users.

3.      During the Relevant Period, FMC launched a strategic restructuring program entitled "Project Focus" that aimed to maximize the Company's efficiencies, right-size its cost

base, and work to normalize the inventory levels of its distributors. This was largely in reaction to a massive 29 percent year-over-year decrease in third quarter revenues in 2023 that resulted from FMC's distributors stockpiling crop protection products to guard against supply chain disruptions caused by the COVID-19 pandemic. Because these distributors now held excess channel inventory, their efforts to decrease their own inventories led to drastic decreases in revenues for FMC. The Company's revenues at this time also suffered a result of increased competition by generics for its top-selling products: its diamide insecticides.

4.      After implementing Project Focus, the Individual Defendants repeatedly represented to investors that because of this new initiative, FMC was making progress towards its stated aims, and that its channel inventories were normalizing more quickly than FMC had predicted. Furthermore, FMC told investors that Project Focus and its associated cost reductions would contribute to FMC's future profits. However, these rosy representations failed to disclose, *inter alia*, that FMC effectively passed a large portion of these expected profits to its distributors by implementing "cost-plus" pricing agreements with several of said distributors.

5.      The truth emerged on February 4, 2025, when the Company reported its fourth quarter 2024 revenue, admitting it had missed consensus revenue estimates by $90 million. At this time, FMC also announced that "growth was below [FMC's] expectations" because it had discovered that during that quarter, "customers in many countries sought to hold significantly less inventory than they [had] historically." FMC paired this with the issuance of a pessimistic financial outlook for 2025, which was the result of "weaker demand in the channel" caused by "customers in many countries prioritiz[ing] holding lower-than-historical levels of inventory."

6.      On this news, the Company's stock price fell $18.12 per share, or approximately 33.5%, from a closing price of $54.04 on February 4, 2025, to close at $35.92 per share on February 5, 2025. FMC lost over $2 billion in market capitalization in a single day.

7.      During the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by making and/or causing the Company to make a series of materially false and misleading statements which failed to disclose, *inter alia*, that: (1) Project Focus was failing to meet its goal of significantly reducing Company inventory in the distribution channel; (2) the Company's channel inventories were failing to either rebalance or normalize, and were instead continuing to worsen; (3) Project Focus was failing to accelerate reduction in manufacturing cost; (4) the Company's cost-plus pricing agreements with several of its important distributors would drastically lower its revenues and profits near-term; (5) FMC's risk disclosures were materially false and misleading because they characterized as mere possibilities adverse facts that had in fact already materialized; and (6) as a result of the above, Defendants' positive statements regarding the Company's business, operations, and prospects were materially false and/or misleading and lacked a reasonable basis at all relevant times.

8.      Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. The Company repurchased approximately 60,884 shares at artificially inflated prices between November 2023 and January 2025 for a total cost to the Company of approximately $3.4 million. As the Company's stock was actually worth only $35.92 per share, the price at close on February 5, 2025, the Company overpaid by approximately $1.2 million in total for repurchases of its own stock during the Relevant Period.

9.     In light of the Individual Defendants' misconduct—which has subjected the Company and various of its former and current officers and directors to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Pennsylvania (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged because of the Individual Defendants' knowing or reckless breaches of their fiduciary duties, and other misconduct.

10.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendants Douglas's, Brondeau's, and Sandifer's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b),

78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

<div align="center">

**PARTIES**

</div>

**Plaintiff**

15.     Plaintiff is a current shareholder of FMC. Plaintiff has continuously held FMC common stock at all relevant times.

**Nominal Defendant FMC**

16.     FMC is a Delaware corporation with principal executive offices at 2929 Walnut Street, Philadelphia, Pennsylvania, 19104. FMC's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FMC."

**Defendant Douglas**

17.     Defendant Douglas served as President and Chief Executive Officer ("CEO") of FMC from June 2020 until June 2024 and as President and Chief Operating Officer of FMC from June 2018 until June 2020. Defendant Douglas previously served as Vice President, Global Operations and International Development of FMC.

18.     The Schedule 14A the Company filed with the SEC on March 15, 2024 (the "2024 Proxy Statement") stated the following about Defendant Douglas:

> Mr. Douglas was appointed President and Chief Executive Officer on June 1, 2020. He served as President and Chief Operating Officer of FMC from June 2018 until June 2020. He joined FMC in March 2010 as Vice President, Global Operations and International Development, and has served as President of the Industrial Chemicals Group and President of the Agricultural Solutions business. Mr. Douglas joined FMC from The Dow Chemical Company where he was Vice President, President Asia, Dow Advanced Materials. Prior to Dow, he was Corporate Vice President, President Asia, Rohm and Haas Company, based in Shanghai. During his twenty-one years with Rohm and Haas, Mr. Douglas held sales, marketing and executive management positions in London, Singapore, Shanghai, and Philadelphia.

**Defendant Sandifer**

19.     Defendant Sandifer has served as the Company's EVP and CFO since May 2018. Defendant Sandifer previously joined FMC in 2010 as its Vice President, Strategic Development.

20.     The Schedule 14A the Company filed with the SEC on March 14, 2025 (the "2025 Proxy Statement") stated the following about Defendant Sandifer:

> **Andrew Sandifer** was named executive vice president and chief financial officer in May 2018. Andrew joined FMC in 2010 as vice president, Strategic Development, with overall responsibility for all mergers and acquisitions and strategic planning activities. He was named vice president, Corporate Transformation in 2014 and led several efforts to transform FMC's portfolio, including leading the enterprise-wide integration of Cheminova A/S, a global agricultural chemical company acquired by FMC, until being named Treasurer in 2016. Before joining FMC, Andrew was vice president, Strategic Initiatives, for ARAMARK Corporation. Prior to ARAMARK, he spent seven years with Rohm and Haas Company, now part of The Dow Chemical Company, where he held roles in Strategic Planning, Sales, Marketing, Investor Relations, and General Management. Earlier in his career Andrew spent five years with the Boston Consulting Group and held engineering, operations, and technical roles with International Paper and James River Paper companies. Andrew earned bachelor's and master's degrees in Industrial Engineering from Georgia Tech, and received his MBA from Harvard Business School. Andrew serves on the Board of Directors for Koppers Holdings Inc., as well as on the Board of Trustees of Germantown Academy, where he is a member of the Finance, Audit, and Investment Committees.

**Defendant Brondeau**

21.    Defendant Brondeau has served as the Company's CEO since June 2024 and as Chairman of the Board since October 2010. He was also CEO of FMC from January 2010 until May 2020, President from January 2010 until May 2018, and Executive Chairman from June 2020 to April 2021. In addition, Defendant Brondeau serves as the Chair of the Executive Committee.

22.    The 2025 Proxy Statement stated the following about Defendant Brondeau:

Mr. Brondeau became Chief Executive Officer in June 2024 and has served as Chairman of the Board since October 2010. He was also Chief Executive Officer of FMC from January 2010 until May 2020, President from January 2010 until May 2018, and Executive Chairman from June 2020 to April 2021. Before joining the Company as President and Chief Executive Officer in January 2010, Mr. Brondeau served as President and Chief Executive Officer, Dow Advanced Materials Division, until his retirement in September 2009. Prior to Dow's acquisition of Rohm and Haas Company in April 2009, he was President and Chief Operating Officer of Rohm and Haas from May 2008. Mr. Brondeau held numerous executive positions during his tenure at Rohm and Haas from 1989 through May 2008 in Europe and the United States, with global responsibilities for marketing, sales, research and development, engineering, technology and operations.

**Defendant Cordeiro**

23.    Defendant Cordeiro has served as a Company director since 2011. Defendant Cordeiro also serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee and Executive Committee.

24.    The 2025 Proxy Statement stated the following about Defendant Cordeiro:

Mr. Cordeiro served as Executive Vice President and Chief Financial Officer of Cabot Corporation from 2009 until May 2018, and served as an advisor to Cabot through the remainder of 2018. He joined Cabot in 1998 and has held several corporate, business and executive management positions including General Manager of Cabot's Fumed Metal Oxides and Tantalum businesses, Vice President of Corporate Strategy, and President of the Americas Region. Prior to joining Cabot, Mr. Cordeiro was a consultant with The Boston Consulting Group and a founding partner of The Economics Resource Group.

**Defendant Davidson**

25.    Defendant Davidson has served as a Company director since July 2020. Defendant Davidson also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

26.    The 2025 Proxy Statement stated the following about Defendant Davidson:

Mr. Davidson was elected to the Company's Board of Directors in July 2020. He served as Senior Vice President, Controller and Chief Accounting Officer of Tyco International from 2004 to 2012 where he led financial reporting, internal controls and accounting policies and processes. Prior to Tyco, Mr. Davidson held senior global leadership positions in finance and related disciplines at Eastman Kodak Company and Dell Computer Corporation. He is a Certified Public Accountant and began his career at Arthur Andersen & Co.

**Defendant Fortmann**

27.    Defendant Fortmann has served as a Company director since 2022. Defendant Fortmann also serves as a member of the Compensation and Human Capital Committee and the Nominating and Corporate Governance Committee.

28.    The 2025 Proxy Statement stated the following about Defendant Fortmann:

Ms. Fortmann has served as Chief Executive Officer of Amyris, Inc., a synthetic biology company, since May 2024. She most recently served, from September 2021 to November 2023, as CEO of ACOMO N.V. (formerly known as Amsterdam Commodities N.V.), a Euronext Amsterdam-listed natural food ingredients company. Ms. Fortmann began her career with DuPont where she held many technical and business roles over her fifteen-year tenure there. From September 2017 through March 2020, she was employed by Royal FrieslandCampina N.V. as its President, FrieslandCampina Ingredients, where she restructured its food ingredients business. In April 2020, she joined International Flavors & Fragrances Inc. where she led the integration of the company and DuPont's ingredients businesses to form the largest ($6 billion) business within International Flavors & Fragrances from 2020 to 2021.

**Defendant Greer**

29.    Defendant Greer has served as a Company director since 2002. Defendant Greer also serves as the Lead Independent Director, as a member of the Executive Committee, and as a member of the Nominating and Corporate Governance Committee.

30.     The 2025 Proxy Statement stated the following about Defendant Greer:

Beginning in June 2006, Mr. Greer was a principal in Greer and Associates, a private investment management firm, until his retirement in 2021. Prior to Greer and Associates, from 1999 until 2005, Mr. Greer held various roles at Flowserve Corporation (a manufacturer of industrial flow management equipment), including President and Chief Operating Officer, as well as Chairman, President and Chief Executive Officer.

**Defendant Johnson**

31.     Defendant Johnson has served as a Company director since 2013. Defendant Johnson also serves as the Chair of the Compensation and Human Capital Committee and as a member of the Executive Committee and the Sustainability Committee.

32.     The 2025 Proxy Statement stated the following about Defendant Johnson:

Ms. Johnson was Executive Chair of Elevance Renewable Sciences, Inc. from October 2015 until February 2016. Prior to being named Executive Chair, Ms. Johnson served for eight years as CEO and President. Previously, Ms. Johnson served as Senior Vice President of the Global Derivatives operating company within BP Innovene, one of the world's largest global petrochemical and refining companies. She has served in a variety of leadership and executive positions for twenty-five years at Amoco Corporation, BP Chemicals, BP Innovene and Elevance.

**Defendant Kempthorne**

33.     Defendant Kempthorne has served as a Company director since 2009. Defendant Kempthorne also serves as the Chair of the Sustainability Committee and as a member of the Compensation and Human Capital Committee.

34.     The 2025 Proxy Statement stated the following about Defendant Kempthorne:

**Governor Kempthorne** served as President and CEO of the American Council of Life Insurers from 2010 to 2018. Prior to that, he served as the 49th United States Secretary of the Interior from June 2006 until January 2009. From January 1999 until his appointment as Secretary of the Interior, Governor Kempthorne served as the Governor of Idaho. Governor Kempthorne has been Chairman of the National Governors Association, Chairman of the Western Governors Association and President of the Council of State Governments. He also served as a member of the Homeland Security Task Force.

**Defendant Øvrum**

35.    Defendant Øvrum has served as a Company director since 2016. Defendant Øvrum also serves as a member of the Sustainability Committee and the Nominating and Corporate Governance Committee.

36.    The 2025 Proxy Statement stated the following about Defendant Øvrum:

Until her retirement in January 2021, Ms. Øvrum served as Executive Vice President of Equinor ASA (formerly known as Statoil ASA) and served on the company's Corporate Executive Committee, to which she had been appointed in 2004. In October 2018, she was named Executive Vice President, Development & Production Brazil. Over her career, Ms. Øvrum has had global responsibility for new energy, health, safety & environment, technology, research, procurement, projects, and drilling. Prior to her most recent position, she held numerous senior leadership positions within Equinor, including Executive Vice President, Technology, Projects & Drilling; Executive Vice President, Technology and New Energy; Executive Vice President, Health, Environment and Safety; Senior Vice President, Operations Support; Vice President, Veslefrikk Field; and Platform Manager.

**Defendant Pallash**

37.    Defendant Pallash has served as a Company director since 2008. Defendant Pallash also serves as a member of the Audit Committee and the Sustainability Committee.

38.    The 2025 Proxy Statement stated the following about Defendant Pallash:

Mr. Pallash joined Visteon Corporation, an automotive parts manufacturer, in September 2001 and, from 2008 to 2013, Mr. Pallash served as its President, Global Customer Group and Senior Vice President. While at Visteon Corporation, Mr. Pallash also served as its Vice President, Asia Pacific and, subsequently, Senior Vice President, Asia Customer Group.

**Defendant Verduin**

39.    Defendant Verduin has served as a Company director since 2023. Defendant Verduin also serves as a member of the Compensation and Human Capital Committee and as a member of the Sustainability Committee.

40.    The 2025 Proxy Statement stated the following about Defendant Verduin:

**Dr. Patricia Verduin** served as Chief Technology & Science Officer of Colgate Palmolive Company from 2009 to 2023, where she navigated complex global regulatory environments and led a global team of over 2,000 scientists, engineers, designers, regulatory, and compliance specialists. In her role at Colgate Palmolive Company, Dr. Verduin had responsibility for driving product formula, manufacturing, and product related sustainable footprint improvements. Prior to her role at Colgate Palmolive Company, she held leadership positions at ConAgra Foods (now known as Conagra Brands, Inc.), Nabisco, and the Consumer Brands Association.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

41.    By reason of their positions as officers, directors, and/or fiduciaries of FMC and because of their ability to control the business and corporate affairs of FMC, the Individual Defendants owed FMC and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage FMC in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of FMC and its shareholders so as to benefit all shareholders equally.

42.    Each director and officer of the Company owes to FMC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

43.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of FMC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

44.    To discharge their duties, the officers and directors of FMC were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

45.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good

faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of FMC, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and directors of the Company, has been ratified by the remaining Individual Defendants, who collectively comprised a majority of FMC's Board at all relevant times.

46.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

47.     To discharge their duties, the officers and directors of FMC were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of FMC were required to, among other things:

      (a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Pennsylvania, and the United States, and pursuant to FMC's own Code of Ethics & Business Conduct (the "Code of Ethics");

      (b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      (c)    remain informed as to how FMC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

      (d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of FMC and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

      (e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that FMC's operations would comply with all applicable laws and FMC's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

      (f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

48.     Each of the Individual Defendants further owed to FMC and the shareholders the duty of loyalty requiring that each favor FMC's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

49.     At all times relevant hereto, the Individual Defendants were the agents of each other and of FMC and were at all times acting within the course and scope of such agency.

50.     Because of their advisory, executive, managerial, directorial, and controlling positions with FMC, each of the Individual Defendants had access to adverse, non-public information about the Company.

51.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by FMC.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

54.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of FMC was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

56.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of FMC and was at all times acting within the course and scope of such agency.

## FMC'S CODE OF ETHICS

57.    According to the Company's Code of Ethics, "[b]ehavior reflecting high ethical standards is expected of all directors, employees and others who are bound by the Code, regardless of position or location," and "[n]o director, officer, manager or supervisor has the authority to violate or require conduct by another employee or any other person that violates the Code, other FMC policies or applicable law."

58.    The Board represents that it adopted the Code of Ethics in part to make clear that all "FMC officers, managers and supervisors are accountable for the actions of the employees who report to them and responsible for seeing that the Code, other FMC policies and applicable laws are followed."

59.    In a section titled "We Comply with the Code, Other FMC Policies, and All Applicable Laws," the Code of Ethics states the following:

> We comply with the Code, other FMC policies and all applicable laws in conducting our business. There are countries where common trading or negotiating practices are based on codes of conduct that are less stringent or different than the Code. In such countries, employees should follow the Code, except for variances that are permitted by applicable law and are based on good ethical and business judgment. The relevant regional president or department head, or a president or vice president of FMC Corporation if no division manager is available, must approve any such variance in writing. Contact an FMC lawyer if you have any questions about the application of the law of any country, about the Code, or about the relation or any apparent conflict between them.

60.    In a section titled "We Keep Accurate Company Records and Make Full, Fair, Accurate, Timely and Understandable Disclosures," the Code of Ethics states the following:

> We make full, fair, accurate, timely and understandable disclosures in reports that FMC files under applicable laws, rules and regulations and in other public

communications. Dishonest reporting, both inside and outside the company will not be tolerated. This includes reporting or organizing information in an attempt to mislead or misinform. No entry will be made on the company's books and records that intentionally hides or disguises the true nature of any transaction. FMC has adopted controls to ensure the safeguarding of FMC assets and the accuracy of its financial records and reports in accordance with internal needs and requirements of applicable laws and regulations. These established accounting practices and procedures must be followed to assure the complete and accurate recording of all transactions. All employees, within their area of responsibility, are expected to adhere to these procedures, as directed by the appropriate FMC manager.

61.     In a section titled "We Avoid Conflicts of Interest," the Code of Ethics states the following, in relevant part:

> We shall not engage in any activity that would create a conflict of interest between our personal interests (including the interests of our immediate families* ) and the best interests of FMC. We will make all business decisions in the best interests of FMC. Any actual or potential conflict of interest between FMC and us is prohibited unless specifically approved in writing by our supervisor (or in the case of a director, the Board of Directors), who shall consult with the General Counsel concerning the matter. In determining the presence or absence of a conflict of interest, the following will be considered: the amount of our financial interest; our position with FMC and the influence that we may have in business dealings that impact the matter; and all other relevant factors.

62.     In a section titled "We Do Not Engage in Insider Trading or Related Unlawful Conduct," the Code of Ethics states the following, in relevant part:

> Employees and directors usually may buy or sell the publicly traded securities of FMC and other companies. However, U.S. law prohibits the buying and selling of publicly traded securities by a person with insider information. Even minor violations of the securities laws can have severe consequences. Penalties include forfeiture of gains, civil penalties of up to three times the profit gained or loss avoided, prison terms, and large fines.

> Insider trading rules apply to all kinds of securities, including common and preferred stock, bonds, commercial paper, options, and warrants. They apply to direct buying and selling by the individual with knowledge and to tipping off a friend or family member who buys or sells. . . . .

> FMC executive officers and directors are also prohibited from trading in FMC's publicly traded securities during any period in which participants in FMC's retirement plans could not engage in a similar type of transaction. Additional details on these restrictions are available through the General Counsel's office.

63.    In a section titled "We Report Suspected Non-Compliance," the Code of Ethics states the following:

> Any employee who learns of a suspected violation of the Code must immediately report it by following the procedure below. Employees are required to come forward with any such information without regard to the identity or position of the suspected offender.
>
> **FMC will treat the information in a confidential manner and will ensure that no acts of retribution or retaliation will be taken against anyone for making a report in good faith.**
>
> **Non-Compliance Reporting Procedure**
>
> • <u>Employee Report</u>: Any employee who learns of a violation of the Code must immediately report it.
> • <u>Investigation</u>: It is FMC's policy and intent to investigate any reported violation of the Code, other FMC policy, or applicable law, and to take appropriate action, as determined by FMC, based on the results of the investigation. Reports of violations of accounting, accounting controls and audit matters will be investigated under the supervision of the Director of Internal Audit and the Audit Committee of the Board of Directors. All other violations will be investigated under the supervision of the Ethics Office. Employees are expected to cooperate in the investigation of reported violations.
> • <u>Confidentiality</u>: Each investigation, all associated documents, and the identities of those involved (reporters, accused parties, investigators, participants, etc.) will be managed confidentially, securely, and on a need-to-know basis. Employees should be aware that the Ethics Office, Corporate Responsibility Committee and Audit Committee are obligated to act in the best interests of FMC and do not act as personal representatives or lawyers for the employees.
> • <u>Protection Against Retaliation</u>: Retaliation in any form against an individual, who in good faith reports a violation of the Code, even if the report is mistaken, or who assists in the investigation of a reported violation, is prohibited. **Every employee may report such violations without fear of retaliation by coworkers, supervisors or others that are the subject of the report.**
>
> (Emphasis in original.)

64.    In violation of the Code of Ethics, the Individual Defendants (as key officers and/or as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading

statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## AUDIT COMMITTEE CHARTER

65.    The Company also maintains an Audit Committee Charter. Under a section titled "Purpose," the Audit Committee Charter states the following about the Audit Committee's main objectives:

> The Audit Committee (the "Committee") of the Board of Directors (the "Board") of FMC Corporation (the "Company") shall assist the Board in monitoring (1) the integrity of the financial statements of the Company, (2) the independent auditor's qualifications and independence, (3) the performance of the Company's internal audit function and independent auditor and (4) the compliance by the Company with legal and regulatory requirements.

> The Committee shall prepare the report required by the rules of the Securities and Exchange Commission (SEC) to be included in the Company's annual proxy report.

66.    Under a section titled "Authority, Duties and Responsibilities," the Audit Committee Charter outlines the Audit Committee's responsibilities as follows:

> The Committee has authority to take appropriate actions necessary to discharge its duties and responsibilities, which includes but is not limited to the powers mentioned below. Among its specific authorities, duties, and responsibilities, the Committee shall:

> A. Review Procedures

> 1.   Meet to review and discuss with management and the independent auditor the annual audited financial statements, including disclosures made in Management's Discussion and Analysis and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

> 2.   Meet to review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q,

including disclosures made in Management's Discussion Analysis, and the results of the independent auditor's review of the quarterly financial statements.

3.   In connection with the reviews of the Form 10-K's and Form 10-Q's above, review and discuss with management and the independent auditor the following matters, as applicable:

> a. Significant issues regarding accounting principles, financial reporting, financial statement presentation, and judgments made in the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles;
> b. Significant issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies;
>
> c. The independent auditor's report on:
>
>> i. All critical accounting policies and practices to be used;
>>
>> ii. Alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor;
>>
>> iii. Other material written communication between the independent auditor and management, such as any management letter or schedule of unadjusted differences;
>
> d. Matters required to be discussed by PCAOB Standard No. 1301 "Communications with Audit Committees" relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, and any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.
>
> e. Disclosures made to the Committee by the Company's CEO and CFO regarding compliance with their certification obligations as required under the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder, including the Company's disclosure controls and procedures and internal controls over financial reporting and evaluations thereof.
>
> f. The effect of regulatory and accounting initiatives, as well as off-balance sheet structures on the Company's financial statements.

4. Discuss with management the Company's policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and risks related to cyber security; steps management has taken to

monitor and control such exposures; and significant estimates affecting the Company's financial statements, such as litigation, tax, and environmental matters.

5. Review with management the Company's earnings press releases, including the use of "pro-forma" or "non-GAAP" information, as well as information and earnings guidance provided to analysts and ratings agencies. Such discussions may be done generally, consisting of discussing the types of information to be disclosed and the types of presentations to be made.

6. Periodically review and discuss with management and internal audit the integrity of Environment, Social and Governance (ESG) reporting metrics included in public filings with the SEC, as well as the related controls, risk exposures, and disclosures.

B. <u>Independent Auditors</u>

1. Have sole authority to appoint or replace the independent auditor, subject to shareholder ratification. The independent auditor shall report directly to the Committee.

2. Be directly responsible for the compensation and oversight of the work of the independent auditors, including the resolution of disagreements between management and the independent auditor regarding accounting and financial reporting, for the purpose of preparing or issuing an audit report or related work.

3. Pre-approve all audit and permitted non-audit services to be performed for the Company by the independent auditor, as described in the Audit Committee PreApproval Policy.

4. Obtain and review a report from the independent auditor at least annually regarding the following:

    a. The independent auditor's internal quality-control procedures;

    b. Material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm;

    c. Steps taken to deal with any such issues;

    d. All relationships between the independent auditor and the Company.

5. Evaluate the qualifications, performance and independence of the independent auditor, including considering whether the provision of permitted non-audit services is compatible with maintaining the auditor's independence, taking into

account the opinions of management and internal auditors. The Committee shall present its conclusions with respect to the independent auditor to the Board.

6. Review and evaluate the lead partner of the independent audit team. Ensure the rotation of the lead audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit, as required by law. Consider whether, in order to assure continuing auditor independence, it is appropriate to adopt a policy of rotating the independent auditing firm on a regular basis.

7. Establish and review policies for the Company's hiring of employees or former employees of the independent auditor who participated in any capacity in the audit of the Company.

8. Discuss with the independent auditor any communications between the audit team and the audit firm's national office respecting auditing and accounting issues presented by management.

9. Discuss with the independent auditor the annual audit plan, including scope, staffing, locations to visit, key risk areas, and general audit approach.

10. Discuss with the independent auditor and internal auditors the effectiveness of the Company's finance and accounting organization.

11. Review reports issued by the independent auditor on greenhouse gas emissions or other ESG metrics as part of required independent third-party assurance.

C. Internal Audit Department

1. Discuss the internal audit plan with the chief audit executive, including the scope, budget and qualifications of the internal audit staff, as deemed necessary.

2. Approve the appointment, performance and replacement of the chief audit executive.

3. Review significant internal audit findings with the chief audit executive, along with management's responses and follow-up to the findings, together with explanations for any significant deviations from the original plan.

D. Compliance and Other Matters

1. Review annually the travel and entertainment expenses of the Chairperson and President, and a summary of all other corporate officers' travel and entertainment expenses.

2. Review and discuss any reports from the Corporate Responsibility Committee, management, internal auditors, and independent auditor regarding the Company's

(including its subsidiary/foreign affiliated entities) conformity with applicable legal requirements and the Company's Code of Ethics and Business Conduct Guidelines.

3. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports, which raise material issues regarding the Company's financial statements or accounting policies.

4. Establish and review procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

5. Conduct or authorize investigations into any matters within the Committee's scope of responsibilities. For that purpose, the Committee shall be empowered to retain independent counsel, accountants, or other advisors to assist in the conduct of such investigations and shall advise the Board as to the nature and extent of such investigations. The Company shall provide for appropriate funding, as determined by the Committee, for payment of compensation to the independent auditor for the purpose of rendering or issuing an audit report and to any advisors employed by the Committee.

67.    In violation of the Audit Committee Charter, the Individual Defendants failed to adequately review and discuss the Company's annual and quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Relevant Background

68.    FMC is a Delaware corporation that represents itself to be "a global agricultural sciences company" and "the fifth largest global innovator in the agrochemicals/crop protection market." The Company focuses on the development and commercialization of so-called crop protection products. Such crop protection products include insecticides, herbicides, fungicides and seed treatments. Two of the Company's largest revenue-generating products are two diamide-class insecticides, Rynaxypyr and Cyazypyr, which had approximate revenues of $1.0 billion and $500

million in 2024, respectively. During the Relevant Period, these two insecticides cumulatively accounted for approximately 40 percent of the Company's total revenues.

69.    The Company sells its products, including Rynaxypyr and Cyazypyr, to a combination of retailers but primarily sells directly to authorized distributors. These distributors, in turn, sell the Company's products to retailers, who ultimately sell FMC products to farmers and other end-users. The Company maintains long-standing relationships with many of its distributors, some of whom the Company has worked with for over twenty-five years and with whom the Company has pre-payment agreements to guarantee continuous supplies of inventory. This provides the Company, in turn, with relatively extensive insight into the inventory levels maintained by its distributors.

70.    During the COVID-19 pandemic, facing economic disruption, and especially supply chain disruptions, many of the Company's distributors overstocked crop protection products. The result, by 2022, was record high revenues for the Company and its competitors. However, as a result of this heavy purchasing activity, these distributors subsequently maintained excess inventory. Because of this, and because the costs of carrying excess inventory had increased and were continuing to do so, these same distributors then reduced their new orders for crop protection products in an attempt to destock their own inventories.

71.    The Company consequently faced a revenue slowdown that was exacerbated by increased competition from generic versions of Rynaxypyr and Cyazypyr. As a result, on October 23, 2023, the Company reported a twenty-nine percent year-over-year decline in revenue for 2023's third quarter because of "channel destocking in all regions."

72.    In response to this "unprecedented downturn in the global crop protection market that resulted in severe channel destocking," the Company implemented a global strategic

restructuring plan named "Project Focus." The stated aims of Project Focus, reflected in the Company's Form 10-K for the fiscal year ended December 31, 2023, were purportedly to "right-size [FMC's] cost base and optimize [FMC's] footprint and organizational structure with a focus on driving significant cost improvement and productivity." The Company represented to investors at all relevant times that Project Focus would result in massive cost savings and increased future profits for the Company.

**False and Misleading Statements**

***FMC Investor Day 2023 Presentation***

73.     The Relevant Period commenced on November 16, 2023, when the Company announced Project Focus to its investors during its "FMC Investor Day 2023" as one of the "actions [FMC was] taking that significantly improve[s] cost efficiencies across the enterprise and drive[s] profitable growth." During this presentation, the Company attempted to quell any uneasiness harbored by its investors, stating that the Company "fully expect[ed] the destocking reset [was] transitory," and highlighting the Company's alleged efforts to ensure that "the channel will begin to rebalance and ease back into somewhat more normal patterns" around "mid-2024." FMC also informed its investors that it expected "***$50 million to $75 million of adjusted EBITDA contribution in 2024 from restructuring actions with approximately $150 million of run-rate savings by the end of 2025.***"

74.     During the presentation's question-and-answer session, Defendant Douglas responded to a question regarding the normalization of channel inventory, stating:

> Q: Michael J. Harrison, Seaport Research Partners: Mark, you talked a little bit earlier about your view that channel inventory levels might be below normal now at least in some regions. What gives you that visibility? Are you doing anything differently now than you have earlier in the year? And if so, what gives you that confidence?

A: Defendant Douglas: Yeah. Certainly when you think about where the industry is today, we're spending a lot more time talking to distribution, retail and where we have access to growers, talking to growers. That's happening in Asia, it's happening in Europe, certainly happening in the US and Brazil. . . . I do think there are certain places and Brazil will get to that point where we see pockets of people drawing their inventories down below normal. That's going to happen. There are some places where it won't be below normal. But I do think in the US, we certainly know that at the grower level and at retail, the inventory levels are way below normal. But at the distribution level, as we enter the season, they're high. So that material will flow through the channel. It's already starting to flow through the channel. ***So we expect that to normalize pretty quickly.***

(Emphasis added.)

***December 18, 2023 Form 8-K***

75.    On December 18, 2023, the Company filed a Form 8-K with the SEC that described

Project Focus's goals, stating:

In response to the unprecedented downturn in the global crop protection market that resulted in severe channel destocking, which has materially impacted volumes in 2023, the Company has initiated a global restructuring plan, which we refer to as "Project Focus." ***This program is designed to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity. The Company's objective for Project Focus is to deliver $50 to $75 million in contributions to adjusted EBITDA in 2024. The Company is further targeting annual run-rate savings of $150 million or more by the end of 2025 from the program once fully implemented.***

(Emphasis added.)

***February 5, 2024 Press Release and Earnings Call***

76.    On February 5, 2024, the Company issued a press release that announced its results

for the fourth quarter ("4Q23") and full fiscal year ended December 31, 2023 (the "2023 Fiscal

Year"). In the press release, the Company boasted that its products "delivered strong results despite

continued destocking." Moreover, Defendant Douglas was quoted in the press release as stating

that in "***the fourth quarter [FMC] observed continued channel destocking in all regions.***" The

press release continued by stating that "[f]irst quarter revenue is expected to be in the range of

$925 million to $1.075 billion, a 26 percent decrease at the midpoint compared to first quarter

2023 *due to lower volume from destocking activity in all regions.*"

77.    The following day, February 6, 2024, FMC held an earnings call to announce its

4Q23 results, which was led by Defendants Douglas and Sandifer. During the call's question-and-

answer session, Defendant Douglas responded to a question regarding the rebalancing of

inventory:

> Q: Okay. Thank you for that. And then secondly, perhaps for Andrew, can you talk
> about the amount of working capital that you think you can extract in 2024,
> including inventory. And as you draw down inventory, what impact do you think
> or do you expect that will have on your earnings, if any, I imagine it creates fixed
> cost absorption challenge. Is that true? And how would your guide be different if
> you weren't drawing down inventory, if that makes sense?
>
> A: Defendant Sandifer: Yes. Thanks, Kevin. Sure. I think certainly, as we're
> looking to free cash flow for 2024. Working capital, particularly accounts payable
> and to a lesser degree, inventory are really the big drivers of cash release in 2024.
> *And that's in part because of an expectation as we go through the year, then we
> start rebalancing and production and inventory.* We have been intentionally
> throttling back pretty severely manufacturing over the past two quarters and well
> into Q1. We would expect to see some ramping back up in manufacturing activity
> as we go through Q2 through Q4. That will help with bringing up accounts payable.
>
> (Emphasis added.)

*2023 Form 10-K*

78.    On February 27, 2024, the Company filed its annual report on Form 10-K with the

SEC for the 2023 Fiscal Year (the "2023 10-K"), which was signed by Defendants Sandifer,

Brondeau, Douglas, Cordeiro, Davidson, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash,

and Verduin. In the 2023 10-K, the Company included, as among one of its risk factors, "channel

inventory behavior." The 2023 10-K described the "channel inventory behavior" risk factor as

follows:

> Channel inventory behavior – The Company relies in many countries and in varying
> degrees on distribution channels to access the market and reach farmers or other

end use customers. ***An abrupt and widespread shift in purchasing behaviors (e.g., the current inventory destocking phenomenon) by channel partners and end use customers has and may continue to negatively and materially impact the Company's volumes across important markets, which has adversely affected and may continue to adversely affect our results of operations.*** Such adverse effects could include but not be limited to materially reduced volumes purchased by customers, resulting in not only reduced sales, but also the Company bearing higher volumes of unsold product inventory, excess raw materials, and correspondingly increased carrying costs.

79.     Appended as exhibits to the 2023 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Douglas and Defendant Sandifer certifying that the 2023 10-K "fully complie[d] with the requirements of Section 13(a) of the Securities Exchange Act of 1934" and that the "information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

80.     The statements identified in ¶¶73-79 above were materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) Project Focus was failing to meet its goal of significantly reducing Company inventory in the distribution channel; (2) the Company's channel inventories were failing to either rebalance or normalize, and were instead continuing to worsen; (3) Project Focus was failing to accelerate reduction in manufacturing cost; (4) the Company's cost-plus pricing agreements with several of its important distributors would drastically lower its revenues and profits near-term; (5) FMC's risk disclosures were materially false and misleading because they characterized as mere possibilities adverse facts that had in fact already materialized; and (6) as a result of the above, Defendants' positive statements regarding the Company's business, operations, and prospects were materially false and/or misleading and lacked a reasonable basis at all relevant times.

***March 15, 2024, Proxy Statement***

81.     On March 15, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallas, and Verduin solicited the 2024 Proxy Statement, which was filed pursuant to Section 14(a) of the Exchange Act and contained material misstatements and omissions.

82.     The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) reelect the eleven directors to the Board, each for a term of one year; (2) ratify the appointment of KPMG LLP as FMC's independent registered public accounting firm for 2024; (3) hold an advisory (non-binding) vote on executive compensation; (4) vote on a stockholder proposal requesting simple majority vote, if properly presented; and (5) consider and act upon any other business properly brought before the meeting.

83.     With respect to the Company's Code of Ethics, the 2024 Proxy Statement stated:

> The Company has a Code of Ethics and Business Conduct that applies to all directors, officers (including its Chief Executive Officer, Chief Financial Officer and Controller) and employees. It is posted on the Investor Relations page of the Company's website under "Governance —Corporate Policies" at investors.fmc.com/governance/corporate-policies/.
>
> The Company intends to post any amendments to, or waivers from, the Code of Ethics and Business Conduct required to be disclosed by either SEC or NYSE regulations on the "Governance — Corporate Policies" section of the Investor Relations page of the Company's website at investors.fmc.com/governance/corporate-policies/.

84.     In a section titled "Board's Role in Overseeing the Risk Management Process," the 2024 Proxy Statement stated the following about the Board's risk oversight responsibilities, in relevant part:

> As part of the Company's risk management process, the Board regularly discusses with management the Company's major risk exposures, their potential financial impact on the Company, and the steps the Company takes to manage them. The Board also reviews the designation of the management person or entity responsible for managing such risks, and evaluates the steps being taken to mitigate the risks. The Board's monitoring role is carried out by either the full Board or a Committee

that reports to the Board, depending on the risk in question. The Board has determined that a separate Risk Committee is not warranted at this time.

85.    Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallas, and Verduin caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Project Focus was failing to meet its goal of significantly reducing Company inventory in the distribution channel; (2) the Company's channel inventories were failing to either rebalance or normalize, and were instead continuing to worsen; (3) Project Focus was failing to accelerate reduction in manufacturing cost; (4) the Company's cost-plus pricing agreements with several of its important distributors would drastically lower its revenues and profits near-term; (5) FMC's risk disclosures were materially false and misleading because they characterized as mere possibilities adverse facts that had in fact already materialized; and (6) as a result of the above, Defendants' positive statements regarding the Company's business, operations, and prospects were materially false and/or misleading and lacked a reasonable basis at all relevant times.

86.    The 2024 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

87.    As a result of Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallas, and Verduin causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallas,

and Verduin to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of KPMG LLP as the Company's independent registered public accounting firm for 2024; and (3) approve an advisory (non-binding) vote on executive compensation.

### *May 6, 2024 Press Release and Earnings Call*

88.    On May 6, 2024, the Company issued a press release to announce its results for the first quarter of 2024 ended March 31, 2024 ("1Q24"). In the press release, Defendant Douglas was quoted as stating that FMC's "***second quarter revenue outlook includes volume growth for the first time since global destocking began in the second quarter of 2023***."

89.    That same day, FMC held an earnings call with analysts and investors to discuss its 1Q24 results. During this call, Defendant Douglas stated:

> ***Data from third parties as well as input from our commercial teams, shows that the inventory reduction actions in the channel are making good progress.*** On a regional basis, the pace of destocking is varied. We see North America furthest along with inventories at the retail and grower level back to normal, while distributors are still working to reduce their level of inventory.
>
> EMEA is in a similar condition, except in countries hit by unfavorable weather. ***In both these geographies, our customers are now targeting to operate with inventories at lower than normal levels.*** In Latin America, inventories are materially lower and are expected to trend towards more normal levels as we move through the rest of the year. We expect India destocking to persist well into 2025, but parts of Asia, such as ASEAN and Pakistan, have made strong progress in destocking in Q1.
>
> ***While these activities continue to run their course, we're encouraged by the first signs that customers are starting to return to historical order patterns***. In North America, we continue to receive orders for products that will be used early in the current season, which indicates that the inventories of such products have now been depleted. In Brazil, customers are now discussing next season's volumes, providing visibility that we did not have last year. ***Our full year outlook assumes that the market improves as the year progresses, but the customers will seek to hold lower levels of inventory.***

We are forecasting our second quarter results to be similar to the prior year. Sales are expected to be between $1 billion and $1.15 billion, which represents a year-on-year growth of 6% at the midpoint, driven by higher volume. ***This is the first quarter during which we expect to report an improvement in year-over-year volume since the start of global destocking.*** Price is anticipated to be a headwind in the low- to mid-single digits and the FX outlook is neutral.

[…]

***EBITDA in the second quarter is expected to be between $170 million and $210 million, up 1% versus the prior year at the midpoint.*** At the EBITDA midpoint, we expect that volume growth and restructuring benefits will be offset by lower price and COGS headwinds. Adjusted earnings per share is expected to be between $0.43 and $0.72, an increase of 15% at the midpoint, due mainly to lower interest expense and D&A.

(Emphasis added.)

90.    Later, during the question-and-answer segment of the call, Defendant Douglas responded to a question regarding the normalization of channel inventory. Edlain Rodriguez of Mizuho Securities asked Defendant Douglas "[a]s inventory destocking comes to an end and as you get into 2025 . . . how do you see volume grow for the portfolio in 2025 and 2026?" In response, Defendant Douglas stated:

Listen, as we go through 2025, I think we've said that we expect what we would consider a more normal type of growth for the marketplace. Acres continue to grow, certainly, in Latin America and Brazil, so we expect that to be a driver. ***And don't forget, at that point, people will be then resetting from a lower level of inventory. So, you would expect more of a normal market growth.*** Typical market like this grows at anywhere from 2% to 3% per annum, and we generally speaking with our differentiated portfolio, outgrow the market in the long haul.

So, I think it's more about a normalized market. Demand on the ground, as we said, even in these conditions, is very good, we expect that to continue. As pressure continues to change, so we see that market piece as being pretty robust. Obviously, our NPIs are growing rapidly, so we would expect 2025 and 2026 to be actually faster than the growth we see in 2024.

And then, the other piece of which is not really market driven, but just a view of 2025, we have a lot of cost headwinds flowing against us right now that are obviously depressing our EBITDA and our EBITDA margin. ***Those turn into tailwinds as we go into next year and I think it's an important facet as we walk***

*through the next couple of earnings calls, as we build out the picture of what 2025 is going to look like, you certainly have got a more stable, more robust external market.* But we also have some pretty significant tailwinds in the sense of how we think about our P&L.

(Emphasis added.)

### *May 7, 2024 Form 10-Q*

91.    On May 7, 2024, the Company filed its quarterly report on Form 10-Q with the SEC, reporting the Company's financial results for 1Q24 (the "Q1 2024 10-Q"). In the Q1 2024 10-Q, the Company stated:

> We expect 2024 free cash flow (Non-GAAP) to fall within a range of approximately $400 million to $600 million. At the mid-point of the range, *there is a significant increase year over year driven largely by the rebuilding of payables and lower inventory*. . . . In response to the unprecedented downturn in the global crop protection market that resulted in severe channel destocking, we initiated the Project Focus global restructuring plan. *This program is designed to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity.*

(Emphasis added.)

92.    Appended to the Q1 2024 10-Q as an exhibit were SOX certifications signed by Defendant Douglas and Defendant Sandifer certifying that the Q1 2024 10-Q "fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [Q1 2024 10-Q] fairly presents, in all material respects, the financial condition and results of the company."

### *BMO Global Farm to Market Conference Remarks*

93.    On May 15, 2024, the Company attended the BMO Global Farm to Market Conference. As a participant, Defendant Douglas, in his opening remarks, stated, with respect to FMC's channel inventory levels, that:

> I think many of you are aware of all the issues we've had coming out of COVID with supply chains, with destocking. That's something that's on everybody's mind.

Certainly is on Andrew and I's – with my mind, I think *as we go through the rest of this year and as we certainly go into 2025, you're going to start to see a more normalization.* It's not going to be smooth. It's going to be bumpy. *But we're getting to the end of this destocking period, and I think that's an important facet for investors to recognize that supply chains can't empty forever and they have to replenish. That's the phase we're in now.* We call it a transition this year. I think that's an apt description.

(Emphasis added.)

94.    The BMO Global Farm to Market Conference featured a question-and-answer session. During this question-and-answer session, Defendant Douglas spoke about channel inventory levels in response to a question on the topic, stating:

Q: Joel Jackson, BMO Capital Markets: Why don't we talk about more regional, so we're talking more broad and maybe you can break down each region and talk about where the – how we're flipping from destocking to restocking? And how you see inventories in each region right now.

A: Defendant Douglas: Yeah, I think I think there's been a lot of commentary around the different regions of the world. North America is probably the furthest along, was one of the first regions to get hit by this change. I would say, distribution still a little high, retail and grower is very low. *So North America is in pretty good shape. Europe's the next that is going through their season now. So they started to deplete last year. Depleting a lot more now.* Asia is a mixed bag. India inventories are very high, that – we have high inventory, others in the industry have high inventory. That's mainly due to weather, though not necessarily the same dynamics as we see in the rest of the world. And then Latin America I mean, Latin America is finishing its season now. It's not bad. It's not exactly where it should be, but it's getting there. *So as we roll into the 2024-2025 season in Q4 this year, it'll be in much better shape.*

(Emphasis added.)

*2024 Wells Fargo Industrials Conference Remarks*

95.    On June 11, 2024, FMC participated in the 2024 Wells Fargo Industrials Conference. In opening remarks, Defendant Sandifer made the following statements with respect to FMC's then-present channel inventory levels:

*We're actually sitting in places where inventories are well below what has been historically held in the channel.* And we have a few places where we're a little

slow to meet an order occasionally because we don't always have every single product on the shelf someone might want. There's a reason these products are carried in inventory during a growing season.

The demand for them can be fickle and hard to predict. When bugs show up in your field, you need an insecticide today. Not two weeks from now, not five weeks from now, you need it today. ***So we are seeing these things rebalance. The timing and the magnitude of that rebalancing $324 million is a bit, it is a complicated issue we're working through. But I think fundamentals here, the in market demand is still strong as the channel inventory corrects. And we get more in sync the flow from manufacturers through the distribution channel into the grower hands, we will see a rebalancing and a rebasing of the business.***

And that's where we see a pivot back to FMC of all in terms of our ability to drive growth with technology, with differentiation and with a closeness to customers and there's certainly places we can put down here on all those topics.

(Emphasis added.)

96.     The Wells Fargo Industrials Conference featured a question-and-answer session, during which Defendant Sandifer was asked about FMC's channel inventory levels. Richard Garchitorena, of Wells Fargo Capital Markets asked whether "as we enter 2025, the expectation is that inventories at that point should be at a place where?" In response, Defendant Sandifer stated:

Yeah, I think as we move into 2025, look I'm very careful about using the word normal because we've been through a period in the last five years. And I think anybody who tries to define normal at this point to fool's game. ***What we are seeing is improving conditions. We are seeing channel inventories reduce, we will see a rebalancing, a resining of pull through by growers from all the way back up channel back to manufacturers where that's been broken in the past four quarters as that channel, the inventory that built up in between needed to be drawn down.***

***Defendant Douglas Steps Down as CEO and President, Resigns from Board***

97.     On June 11, 2024, FMC filed a Form 8-K with the SEC to announce that the Company's Board had appointed Defendant Brondeau to succeed Defendant Douglas as the CEO of FMC. Defendant Douglas, meanwhile, had stepped down from his roles of President and CEO and had resigned as a member of the Board. Defendant Douglas agreed to serve as an executive advisor to FMC's senior management through September 1, 2024. Non-party Ronaldo Periera was

elected FMC's President, effective June 11, 2024. This change in leadership was ostensibly driven by the need for a stronger stocking reset and more aggressive actions to combat market challenges to better position FMC for future growth.

### July 31, 2024 Press Release

98.    Subsequently, on July 31, 2024, FMC issued a press release in which it announced its results for the second quarter ended June 30, 2024 ("2Q24").The press release quoted Defendant Brondeau, who stated that "[d]emand improved during the second quarter, resulting in a pronounced increase in [FMC's] sales volumes, most notably within the United States and Brazil, *despite customers continuing to actively manage inventory.*" Defendant Brondeau continued, stating that "*[FMC] expect[s] demand to increase as the year progresses even as customers maintain a careful approach of managing inventory.*"

### August 1, 2024 Form 10-Q

99.    On August 1, 2024, the Company filed its quarterly report on Form 10-Q with the SEC to report the Company's financial and operational results for 2Q24 (the "2Q 2024 10-Q"). In the 2Q 2024 10-Q, FMC reported that it had been working to implement Project Focus's restructuring plan to "*right-size [FMC's] cost base and optimize [FMC's] footprint and organizational structure with a focus on driving significant cost improvement and productivity.*" Therein, FMC further stated that it "*expect[ed] the plan to be fully executed by the end of 2025.*"

100.    The Q2 2024 10-Q included as an exhibit SOX certifications signed by Defendant Brondeau and Defendant Sandifer certifying that the Q2 2024 10-Q "fully complie[d] with the requirements of section 13(a) of the Securities and Exchange Act of 1934," and that "[t]he information contained in the [Q2 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

### *August 1, 2024 Earnings Call*

101.     On August 1, 2024, the same day FMC filed its 2Q 2024 10-Q, the Company held an earnings call with analysts and investors to discuss its 2Q24 results. During this call, Defendant Brondeau stated that FMC "delivered a solid Q2, helped by the successful execution of [FMC's] restructuring program." Furthermore, Defendant Brondeau stated that FMC "***expect[ed] continued growth in Q3 and Q4 from demand recovery, led by the Americas, where we expect channel inventory to approach normal levels by year-end.***"

102.     Later during the earnings call, Defendant Brondeau stated that "Q2 through Q4 also show higher revenue driven by volume with the rate of growth accelerating in Q4 as we shift into the next crop season. ***The markets have begun to recover as channel inventories are starting to normalize, even if not as fast as [FMC] had previously expected.***"

### *October 29, 2024 Press Release*

103.     On October 29, 2024, the Company issued a press release to announce its financial results for the third quarter ended September 30, 2024 ("3Q24"). In the press release, the Company stated that "[r]evenue growth in the quarter of 9 percent was driven by a 17 percent increase in volume, with some North America second half orders occurring earlier than expected ***due to improved channel inventory levels.***"

### *October 30, 2024, Form 10-Q*

104.     On October 30, 2024, the Company filed its quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for 3Q24 (the "Q3 2024 10-Q"). In the Q3 2024 10-Q, the Company stated that it had been actively implementing Project Focus's restructuring plan to "***right-size [FMC's] cost base and optimize [FMC's] footprint and organizational structure with a focus on driving significant cost improvement and productivity.***"

Furthermore, the Company stated in the Q3 2024 10-Q that it *"expect[ed] the plan to be fully executed by the end of 2025."*

105.    Appended as an exhibit to the Q3 2024 10-Q were SOX certifications signed by Defendant Brondeau and Defendant Sandifer certifying that the Q3 2024 10-Q "fully complie[d] with the requirements of section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [Q3 2024 10-Q] fairly present[ed], in all material respects, the financial condition and results of operations of the company."

### October 30, 2024, Earnings Call

106.    On October 30, 2024, the same day it filed the Q3 2024 10-Q, the Company hosted an earnings call with analysts and investors to discuss its 3Q24 results. During the earnings call, Defendant Brondeau stated:

> Looking ahead, *our view on the timeline of channel inventory recovery is relatively unchanged from what we communicated during our August earnings call.* The U.S. and most countries in Europe are normalizing the fastest and Latin America is expected to be much improved in the second quarter of 2025. Asia markets are still expected to be very challenging in 2025 with no recovery expected until 2026 as India continues to work through excess channel inventory.
>
> *On a cost basis, we are accelerating the delivery of savings and increasing our targets.* We are now targeting cost benefits from 6 restructuring of $125 million to $150 million to be reflected in the P&L in 2024, with greater than $225 million of gross run-rate in 2025. To accomplish this, we are accelerating restructuring, taking new critical initiatives to realign our manufacturing footprint, and using attrition as a key tool to drive further savings.

(Emphasis added.)

### December 4, 2024, Goldman Sachs Industrials and Materials Conference Remarks

107.    On December 4, 2024, FMC participated in the Goldman Sachs Industrials and Materials Conference. At this conference, during a question-and-answer session, Defendant Brondeau was asked by an unidentified speaker about channel inventory. In response, he stated:

Q: Unidentified speaker: When you look at kind of the high watermark for that inventory and where you think you're at today with your products through the chain, how would you categorize the delta? Are you where you want to be all the way through the chain, or do you think there's still some more inventory to come out?

A: Defendant Brondeau: I think it's very region dependent. ***We are pretty comfortable with North America and Europe. Things are happening well in Latin America and Brazil, Argentina, where we see product going through the channel with the season, which is turning out despite the delay in rain, pretty good. So we believe Latin America will get by a normalized channel toward the second quarter.***

(Emphasis added.)

108.    The statements identified in ¶¶88-96 and ¶¶ 98-107 were materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) Project Focus was failing to meet its goal of significantly reducing Company inventory in the distribution channel; (2) the Company's channel inventories were failing to either rebalance or normalize, and were instead continuing to worsen; (3) Project Focus was failing to accelerate reduction in manufacturing cost; (4) the Company's cost-plus pricing agreements with several of its important distributors would drastically lower its revenues and profits near-term; (5) FMC's risk disclosures were materially false and misleading because they characterized as mere possibilities adverse facts that had in fact already materialized; and (6) as a result of the above, Defendants' positive statements regarding the Company's business, operations, and prospects were materially false and/or misleading and lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

109.    The truth emerged on February 4, 2025 when the Company reported its financial results for the fourth quarter of 2024, reporting that it missed consensus revenue estimates by $90 million. This same report also disclosed that growth was far below the Company's predictions "as

[it] learned during the quarter that customers in many countries sought to hold significantly less inventory than they have historically."

110.    FMC also reported that its 2025 outlook was very poor, revealing that it expected revenue to remain flat as a result of "weaker demand in the channel as customers in many countries prioritize holding lower-than-historical levels of inventory."

111.    On an earnings call that day, the Company revealed that its cost-plus pricing arrangements with certain of its diamide wholesalers would cause a $130 million EBITDA headwind for 2025. Also during the call, FMC announced that it "need[s] to significantly lower FMC inventory in the channel much beyond what we were expecting."

112.    On this news, the Company's stock price fell $18.12 per share, or approximately 33.5%, from a closing price of $54.04 on February 4, 2025, to close at $35.92 per share on February 5, 2025. FMC lost over $2 billion in market capitalization in a single day.

## REPURCHASES DURING THE RELEVANT PERIOD

113.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $3.4 million to repurchase 60,884 shares of its own common stock at artificially inflated prices between November 2023 and January 2025.

114.    According to the 2023 10-K, between November 1, 2023 and November 30, 2023, the Company purchased 882 shares of its common stock for approximately $47,125 at an average price per share of approximately $53.43.[1]

---

[1] Upon information and belief, these repurchases occurred during the Relevant Period.

115.    As the Company's stock was actually worth only $35.92 per share, the price at closing on February 5, 2025, the Company overpaid by approximately $15,444 for repurchases of its own stock between November 1, 2023 and November 30, 2023.

116.    According to the 2023 10-K, between December 1, 2023 and December 31, 2023, the Company purchased 726 shares of its common stock for approximately $40,569 at an average price per share of approximately $55.88.

117.    As the Company's stock was actually worth only $35.92 per share, the price at closing on February 5, 2025, the Company overpaid by approximately $14,491 for repurchases of its own stock between December 1, 2023 and December 31, 2023.

118.    According to the Q1 2024 10-Q, between January 1, 2024 and January 31, 2024, the Company purchased 1,482 shares of its common stock for approximately $85,882 at an average price per share of approximately $57.95.

119.    As the Company's stock was actually worth only $35.92 per share, the price at closing on February 5, 2025, the Company overpaid by approximately $32,648 for repurchases of its own stock between January 1, 2024 and January 31, 2024.

120.    According to the Q1 2024 10-Q, between February 1, 2024 and February 29, 2024, the Company purchased 31,033 shares of its common stock for approximately $1,627,371 at an average price per share of approximately $52.44.

121.    As the Company's stock was actually worth only $35.92 per share, the price at closing on February 5, 2025, the Company overpaid by approximately $512,665 for repurchases of its own stock between February 1, 2024 and February 29, 2024.

122.     According to the Q1 2024 10-Q, between March 1, 2024 and March 31, 2024, the Company purchased 7,306 shares of its common stock for approximately $435,657 at an average price per share of approximately $59.63.

123.     As the Company's stock was actually worth only $35.92 per share, the price at closing on February 5, 2025, the Company overpaid by approximately $173,225 for repurchases of its own stock between March 1, 2024 and March 31, 2024.

124.     According to the 2Q 2024 10-Q, between April 1, 2024 and April 30, 2024, the Company purchased 930 shares of its common stock for approximately $53,791 at an average price per share of approximately $57.84.

125.     As the Company's stock was actually worth only $35.92 per share, the price at closing on February 5, 2025, the Company overpaid by approximately $20,386 for repurchases of its own stock between April 1,2024 and April 30, 2024.

126.     According to the 2Q 2024 10-Q, between May 1, 2024 and May 31, 2024, the Company purchased 1,977 shares of its common stock for approximately $127,358 at an average price per share of approximately $64.42.

127.     As the Company's stock was actually worth only $35.92 per share, the price at closing on February 5, 2025, the Company overpaid by approximately $56,345 for repurchases of its own stock between May 1, 2024 and May 31, 2024.

128.     According to the 2Q 2024 10-Q, between June 1, 2024 and June 30, 2024, the Company purchased 791 shares of its common stock for approximately $44,517 at an average price per share of approximately $56.28.

129.    As the Company's stock was actually worth only $35.92 per share, the price at closing on February 5, 2025, the Company overpaid by approximately $16,105 for repurchases of its own stock between June 1, 2024 and June 30, 2024.

130.    According to the Q3 2024 10-Q, between July 1, 2024 and July 31, 2024, the Company purchased 2,181 shares of its common stock for approximately $126,651 at an average price per share of approximately $58.07.

131.    As the Company's stock was actually worth only $35.92 per share, the price at closing on February 5, 2025, the Company overpaid by approximately $48,309 for repurchases of its own stock between July 1, 2024 and July 31, 2024.

132.    According to the Q3 2024 10-Q, between August 1, 2024 and August 31, 2024, the Company purchased 2,024 shares of its common stock for approximately $124,395 at an average price per share of approximately $61.46.

133.    As the Company's stock was actually worth only $35.92 per share, the price at closing on February 5, 2025, the Company overpaid by approximately $51,693 for repurchases of its own stock between August 1, 2024 and August 31, 2024.

134.    According to the Q3 2024 10-Q, between September 1, 2024 and September 30, 2024, the Company purchased 5,288 shares of its common stock for approximately $348,321 at an average price per share of approximately $65.87.

135.    As the Company's stock was actually worth only $35.92 per share, the price at closing on February 5, 2025, the Company overpaid by approximately $158,376 for repurchases of its own stock between September 1, 2024 and September 30, 2024.

136.    According to the Form 10-K the Company filed with the SEC on February 28, 2025 (the "2024 10-K"), between October 1, 2024 and October 31, 2024, the Company purchased 635

shares of its common stock for approximately $39,580 at an average price per share of approximately $62.33.

137.    As the Company's stock was actually worth only $35.92 per share, the price at closing on February 5, 2025, the Company overpaid by approximately $16,770 for repurchases of its own stock between October 1, 2024 and October 31, 2024.

138.    According to the 2024 10-K, between November 1, 2024 and November 30, 2024, the Company purchased 1,401 shares of its common stock for approximately $79,367 at an average price per share of approximately $56.65.

139.    As the Company's stock was actually worth only $35.92 per share, the price at closing on February 5, 2025, the Company overpaid by approximately $29,043 for repurchases of its own stock between November 1, 2024 and November 30, 2024.

140.    According to the 2024 10-K, between December 1, 2024 and December 31, 2024, the Company purchased 935 shares of its common stock for approximately $46,713 at an average price per share of approximately $49.96.

141.    As the Company's stock was actually worth only $35.92 per share, the price at closing on February 5, 2025, the Company overpaid by approximately $13,127 for repurchases of its own stock between December 1, 2024 and December 31, 2024.

142.    According Form 10-Q that the Company filed with the SEC on May 1, 2025 (the "Q1 2025 10-Q"), between January 1, 2025 and January 31, 2025, the Company purchased 3,293 shares of its common stock for approximately $181,971 at an average price per share of approximately $55.26.

143.    As the Company's stock was actually worth only $35.92 per share, the price at closing on February 5, 2025, the Company overpaid by approximately $63,687 for repurchases of its own stock between January 1, 2024 and January 31, 2025.

144.    Thus, the total payment by the Company for its repurchases during the Relevant Period was approximately $3.4 million as the Company repurchased 60,884 shares of its own stock at artificially inflated prices, representing a total overpayment of approximately $1.2 million.

## **DAMAGES TO FMC**

145.    As a direct and proximate result of the Individual Defendants' conduct, FMC has lost and expended, and will continue to lose and expend, many millions of dollars.

146.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

147.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

148.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

149.    Such losses include the Company's overpayment of approximately $1.2 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

150.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

151.    As a direct and proximate result of the Individual Defendants' conduct, FMC has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## DERIVATIVE ALLEGATIONS

152.    Plaintiff brings this action derivatively and for the benefit of FMC to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of FMC, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act.

153.    FMC is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

154.    Plaintiff is, and has been at all relevant times, a shareholder of FMC. Plaintiff will adequately and fairly represent the interests of FMC in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

155.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

156.    A pre-suit demand on the Board of FMC is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following thirteen individuals: Defendants Brondeau, Cordeiro, Davidson, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, and Verduin (the "Director-Defendants"), and non-parties Anthony DiSilvestro and Steven T. Merkt (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to seven of the thirteen Directors that were on the Board at the time this action was commenced.

157.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, while they caused the Company to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

158.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein and, at the same time, causing the Company to overpay by approximately $1.2 million for repurchases of its own stock during the Relevant Period while the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

159.     Additional reasons that demand on Defendant Brondeau is futile follow. Defendant Brondeau has served as the Company's CEO since June 2024 and as Chairman of the Board since October 2010. He was also CEO of FMC from January 2010 until May 2020, President from January 2010 until May 2018, and Executive Chairman from June 2020 to April 2021. In addition, Defendant Brondeau serves as the Chair of the Executive Committee. The Company provides Defendant Brondeau with his principal occupation, for which the Company compensates him handsomely. Consequently, Defendant Brondeau is, per the Company's own admission, a non-independent director. Defendant Brondeau additionally solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders voting to reelect Defendants Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, Verduin, and himself to the Board, allowing them to continue to breach their fiduciary duties to the Company. Defendant Brondeau also signed the false and misleading 2023 10-K. As FMC's highest officer, and a trusted long-time FMC director, Defendant Brondeau conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme and consciously disregarded his duties to protect corporate assets. Defendant Brondeau is also named as a defendant in the Securities Class Action. For these reasons, too, Defendant Brondeau breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him his futile and, therefore, excused.

160.     Additional reasons that demand on Defendant Cordeiro is futile follow. Defendant Cordeiro has served as a Company director since 2011. He also serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee and the Executive Committee. The Company provides Defendant Cordeiro with handsome compensation

for his role as a director. Additionally, Defendant Cordeiro solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Brondeau, Davidson, Douglas, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, Verduin, and himself to the Board, allowing them to continue to breach their fiduciary duties to the Company. Defendant Cordeiro also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Cordeiro breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161.    Additional reasons that demand on Defendant Davidson is futile follow. Defendant Davidson has served as a Company director since July 2020. Defendant Davidson also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. The Company provides Defendant Davidson with handsome compensation for his role as a director. Additionally, Defendant Davidson solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Brondeau, Cordeiro, Douglas, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, Verduin, and himself to the Board, allowing them to continue to breach their fiduciary duties to the Company. Defendant Davidson also signed the false and misleading 2023 10-K. As a trusted Company director, Defendant Davidson conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and

consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Davidson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him his futile and, therefore, excused.

162.    Additional reasons that demand on Defendant Fortmann is futile follow. Defendant Fortmann has served as a Company director since 2022. Defendant Fortmann also serves as a member of the Compensation and Human Capital Committee and as a member of the Nominating and Corporate Governance Committee. The Company provides Defendant Fortmann with handsome compensation for her role as a director. In addition, Defendant Fortmann solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Brondeau, Cordeiro, Davidson, Douglas, Greer, Johnson, Kempthorne, Øvrum, Pallash, Verduin, and herself to the Board, allowing them to continue to breach their fiduciary duties to the Company. Defendant Fortmann also signed the false and misleading 2023 10-K. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Fortmann breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant Greer is futile follow. Defendant Greer has served as a Company director since April 2002. Defendant Greer also serves as the Lead Independent Director, as a member of the Executive Committee, and as a member of the Nominating and Corporate Governance Committee. The Company provides Defendant Greer with handsome compensation for his role as a director. In addition, he solicited the 2024 Proxy

Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Johnson, Kempthorne, Øvrum, Pallash, Verduin, and himself to the Board, allowing them to continue to breach their fiduciary duties to the Company. Defendant Greer also signed the false and misleading 2023 10-K. As a trusted Company director, Defendant Greer conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Greer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164.    Additional reasons that demand on Defendant Johnson is futile follow. Defendant Johnson has served as a Company director since 2013. Defendant Johnson also serves as the Chair of the Compensation and Human Capital Committee, as a member of the Executive Committee, and as a member of the Sustainability Committee. The Company provides Defendant Johnson with handsome compensation for her role as a director. In addition, Defendant Johnson solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Kempthorne, Øvrum, Pallash, Verduin, and herself to the Board, allowing them to continue to breach their fiduciary duties to the Company. Defendant Johnson also signed the false and misleading 2023 10-K. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant

Johnson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

165.    Additional reasons that demand on Defendant Kempthorne is futile follow. Defendant Kempthorne has served as a Company director since 2009. Defendant Kempthorne also serves as the Chair of the Sustainability Committee and as a member of the Compensation and Human Capital Committee. The Company provides Defendant Kempthorne with handsome compensation for his role as a director. In addition, he solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Øvrum, Pallash, Verduin, Douglas, and himself to the Board, allowing them to continue to breach their fiduciary duties to the Company. Defendant Kempthorne also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Kempthorne breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166.    Additional reasons that demand on Defendant Øvrum is futile follow. Defendant Øvrum has served as a Company director since 2016. She also serves as a member of both the Sustainability and Nominating and Corporate Governance Committees. The Company provides Defendant Øvrum with handsome compensation for her role as a director. In addition, she solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann,

Greer, Johnson, Kempthorne, Pallash, Verduin, and herself to the Board, allowing them to continue to breach their fiduciary duties to the Company. Defendant Øvrum also signed the false and misleading 2023 10-K. As a trusted long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Øvrum breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

167.    Additional reasons that demand on Defendant Pallash is futile follow. Defendant Pallash has served as a Company director since 2008. He also serves as a member of the Audit Committee and as a member of the Sustainability Committee. The Company provides Defendant Pallash with handsome compensation for his role as a director. In addition, he solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Kempthorne, Verduin, and himself to the Board, allowing them to continue to breach their fiduciary duties to the Company. Defendant Pallash also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Pallash breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168.    Additional reasons that demand on Defendant Verduin is futile follow. Defendant Verduin has served as a Company director since 2023. She also serves as a member of the Compensation and Human Capital Committee and  as a member of the Sustainability Committee. The Company provides Defendant Verduin with handsome compensation for her role as a director. In addition, she solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, and herself to the Board, allowing them to continue to breach their fiduciary duties to the Company. Defendant Verdiun also signed the false and misleading 2023 10-K. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Verduin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

169.    Additional reasons that demand on the Board is futile follow.

170.    Defendants Cordeiro (as Chair), Davidson, and Pallash (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including

breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

171.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Ethics, the Director-Defendants failed to maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Ethics and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

172.    FMC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for FMC any part of the damages FMC suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

173.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim

exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

174. The acts complained of herein constitute violations of fiduciary duties owed by FMC's officers and directors, and these acts are incapable of ratification.

175. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of FMC. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of FMC, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

176. If there is no directors' and officers' liability insurance, then the Directors will not cause FMC to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

177.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least seven of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

178.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

180.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

181.    Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, and Verduin caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Project Focus was failing to meet its goal of significantly reducing Company inventory in the distribution channel; (2) the Company's channel

inventories were failing to either rebalance or normalize, and were instead continuing to worsen; (3) Project Focus was failing to accelerate reduction in manufacturing cost; (4) the Company's cost-plus pricing agreements with several of its important distributors would drastically lower its revenues and profits near-term; (5) FMC's risk disclosures were materially false and misleading because they characterized as mere possibilities adverse facts that had in fact already materialized; and (6) as a result of the above, Defendants' positive statements regarding the Company's business, operations, and prospects were materially false and/or misleading and lacked a reasonable basis at all relevant times.

182.    The 2024 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

183.    As a result of Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, and Verduin causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect the eleven directors to the Board, each for a term of one year; (2) ratify the appointment of KPMG LLP as FMC's independent registered public accounting firm for 2024; and (3) hold an advisory (non-binding) vote on executive compensation.

184.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

185.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

186.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding FMC. Not only is FMC now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon FMC by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase 60,884 of its own shares at artificially inflated prices, damaging FMC.

188.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

189.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about FMC not misleading.

190.    The Individual Defendants, as top executives and directors of the Company are liable as direct participants in the wrongs complained of herein. Through their positions of control

and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by FMC.

191.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

192.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

193.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

194.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195.    The Individual Defendants, by virtue of their positions with FMC and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of FMC and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause FMC to engage in the illegal conduct and practices complained of herein.

196.     Plaintiff, on behalf of FMC, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

197.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of FMC's business and affairs.

199.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

200.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of FMC.

201.     In breach of their fiduciary duties owed to FMC, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Project Focus was failing to meet its goal of significantly reducing Company inventory in the distribution channel; (2) the Company's channel inventories were failing to either rebalance or normalize, and were instead continuing to worsen; (3) Project Focus was failing to accelerate reduction in manufacturing cost; (4) the Company's cost-plus pricing agreements with several of its important distributors would drastically lower its revenues and profits near-term; (5) FMC's risk disclosures were materially false and misleading because they characterized as mere possibilities adverse facts that had in fact already materialized; and (6) as a result of the above, Defendants' positive statements regarding

the Company's business, operations, and prospects were materially false and/or misleading and lacked a reasonable basis at all relevant times.

202.    In further breach of their fiduciary duties, the Individual Defendants caused the Company to repurchase 60,884 shares of Company common stock for approximately $3.4 million total while the Company's stock price was artificially inflated due to the false and misleading misrepresentations as alleged herein, resulting in the Company overpaying by approximately $1.2 million.

203.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

204.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed.

205.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

206.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of FMC's securities.

207.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of FMC's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

208.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

209.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, FMC has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

210.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Unjust Enrichment

211.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, FMC.

213.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from FMC that was tied to the performance or artificially inflated valuation of FMC or received compensation or other payments

that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

214.    Plaintiff, as a shareholder and a representative of FMC, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

215.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Abuse of Control

216.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

217.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence FMC, for which they are legally responsible.

218.    As a direct and proximate result of the Individual Defendants' abuse of control, FMC has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, FMC has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

219.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

220.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

221.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of FMC in a manner consistent with the operations of a publicly held corporation.

222.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, FMC has sustained and will continue to sustain significant damages.

223.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

224.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## EIGHTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

225.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

226.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

227.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused FMC to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, to be subject to investigations and civil

inquiries, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

228.    In addition, the Individual Defendants caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

229.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

230.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## <u>NINTH CLAIM</u>

### Against Defendants Douglas, Brondeau, and Sandifer for Contribution Under Sections 10(b) and 21D of the Exchange Act

231.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

232.    FMC and Defendants Douglas, Brondeau and Sandifer are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Douglas's, Defendant Brondeau's, and Defendant Sandifer's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

233.    Defendants Douglas, Brondeau, and Sandifer, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

234.    Accordingly, Defendants Douglas, Brondeau, and Sandifer are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

235.    As such, FMC is entitled to receive all appropriate contribution or indemnification from Defendants Douglas, Brondeau, and Sandifer.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of FMC, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to FMC;

(c)    Determining and awarding to FMC the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing FMC and the Individual Defendants to take all necessary actions to reform and improve FMC's corporate governance and internal procedures to comply with applicable laws and to protect FMC and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and

guidelines of the Board;

 2. a provision to permit the shareholders of FMC to nominate at least seven candidates for election to the board; and

 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

 (e) Awarding FMC restitution from the Individual Defendants, and each of them;

 (f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

 (g) Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: May 29, 2025

<div style="margin-left:40%">

**THE BROWN LAW FIRM, P.C.**

*/s/ Elizabeth Donohoe*
Elizabeth Donohoe
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: edonohoe@thebrownlawfirm.net
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

</div>

## <u>VERIFICATION</u>

I, Steven Curavo, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 26 day of May, 2025.

Signed by:

Steven W Curavo
E298BD21E93346B...

Steven Curavo